UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



BANK OF AMERICA, N.A.,

        Plaintiff,

    v.

WON SAM YI, an individual, SUNG EUN
YI, an individual, COMPREHENSIVE
CANCER SERVICES ONCOLOGY, P.C.,
a New York professional corporation, CCS
EQUIPMENT, LLC, a New York limited
liability company, CCS BILLING, LLC, a
New York limited liability company, CCS
MEDICAL, PLLC, a New York professional
service limited liability company, WSEJ, LLC,
a New York limited liability company, and
UNITED STATES OF AMERICA,

        Defendants.

**DECISION AND ORDER**

1:17-CV-01283 EAW

## <u>INTRODUCTION</u>

On December 8, 2017, Plaintiff Bank of America, N.A. ("Plaintiff") commenced a

breach of contract and guaranty action against Won Sam Yi and Sung Eun Yi (collectively,

the "Yi Defendants"). (Dkt. 1). About two months later, on February 8, 2018, Plaintiff

filed an Amended Complaint against the Yi Defendants, various business entities owned,

operated, or managed by Won Sam Yi ("Dr. Yi")—Comprehensive Cancer Services

Oncology, P.C., CCS Equipment LLC, CCS Billing, LLC, CCS Medical, PLLC, and

WSEJ, LLC (collectively, the "Defendants")—as well as the United States of America (the

"Government"). (Dkt. 15). On the same day, Plaintiff filed a motion seeking an order of

seizure over certain assets in Defendants' possession that were subject to the parties' security agreement (hereinafter, the "Collateral"). (Dkt. 16). Plaintiff also seeks a preliminary injunction enjoining Defendants from dissipating, transferring, or otherwise disposing of the Collateral. Plaintiff claims that it is entitled to an order of seizure pursuant to the parties' security agreement because Defendants have defaulted on various loan obligations and have refused to voluntarily surrender the Collateral. (Dkt. 16-1 at 14-18). Plaintiff also claims that it is entitled to a preliminary injunction to prevent any further interference by Defendants with Plaintiff's interest in the Collateral. (*Id.* at 19-22).

There is no good outcome to the pending motions. Plaintiff seeks to recover the debt owed by Defendants, but in reality the requested seizure order and preliminary injunction will likely not fully compensate Plaintiff for its losses. Defendants provide benefits to the local and regional community as employers of medical professionals and as healthcare providers for apparently thousands of cancer patients. The relief requested by Plaintiff will likely result in a forced shutdown of Defendants' businesses. However, the financial debt owed by Defendants to Plaintiff and the federal and state taxing authorities is substantial, and it appears only to be growing. Defendants have had a number of opportunities over many months to prepare and develop a firm plan for addressing their accumulating debt. Defendants are unable to demonstrate that their present circumstances will materially change if the Court declines to grant the relief requested at this time. Accordingly, to prevent any further depreciation of Plaintiff's contractual rights, the Court grants Plaintiff's application for an order of seizure and a preliminary injunction.

# BACKGROUND[1]

Plaintiff submits several affidavits and a number exhibits in support of its requested relief. (Dkt. 16). Defendants constitute various business entities owned, operated, or managed by Dr. Yi. (Dkt. 16-2 at ¶¶ 6-7). Defendants operate as an oncology practice for the treatment and care of cancer. (*Id.* at ¶ 6).

On January 21, 2016, Plaintiff and Defendants entered into a loan agreement in which Plaintiff opened four separate credit lines to Defendants that, in total, amounted to $16.2 million (the "Loan Agreement"). (*Id.* at ¶ 9). These loans were secured by a security agreement (the "Security Agreement"), which granted Plaintiff "a first priority blanket security interest upon all assets of [Defendants]," including the following:

(a) All accounts, and all chattel paper, instruments, deposit accounts, letter of credit rights, and general intangibles related thereto; and all returned or repossessed goods which, on sale or lease, resulted in an account;

(b) All inventory;

(c) All equipment and fixtures now owned or hereafter acquired by [Defendants] . . . ;

(d) All of [Defendant]'s deposit accounts with [Plaintiff]. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto;

---

[1] The following facts are taken from the Affidavit of Nanette C. Franco, one of Plaintiff's Senior Vice Presidents. (Dkt. 16-2). Defendants dispute any suggestion that they are in dire financial peril or are fraudulently or otherwise wrongfully ignoring their tax obligations, and the merits of the related whistleblower lawsuit. (Dkt. 37; Dkt. 38; Dkt. 39). However, Defendants do not provide an alternative version of the events leading up to the pending application for relief.

(e) All instruments, chattel paper, documents, certificates of deposit, securities and investment property of every type;

(f) All general intangibles. The Collateral shall include all good will connected with or symbolized by any of such general intangibles;

(g) All negotiable and nonnegotiable documents of title covering any Collateral;

(h) All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral;

(i) All substitutes or replacements for any Collateral, all case or non-case proceeds (including insurances proceeds), products, rents and profits of the Collateral, and all income benefits and property receivable on account of the Collateral, and all supporting obligations covering any Collateral; and

(j) All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer software necessary to process such memory ("Books and Records").

(*Id.* at ¶ 10; *see* Dkt. 16-5 at 2 (Security Agreement)). On January 22, 2016, Plaintiff filed a Uniform Commercial Code Financing Statement with the New York Department of State, perfecting its security interest. (Dkt. 16-2 at ¶ 11).

The Parties also executed a "Master Lease Agreement, a Progress Payment Agreement, a Priority Payment Agreement, a certain Schedule No. 1 and an Acceptance Notice" (the "Lease Documents"). (*Id.* at ¶ 13). Pursuant to the Lease Documents, Dr. Yi agreed, among other things, "to pay to [Plaintiff] certain Distributions . . . upon the occurrence of an Event of Default under the Lease Documents." (*Id.* at ¶ 14; *see* Dkt. 16-24 at ¶ 10 (Affidavit of Todd C. Wittenberg); Dkt. 16-25 at 4-5, 11-12, 14 (Lease Documents)). On or about May 4, 2017, Dr. Yi also executed a "Limited Guaranty" as security for the payment of all of Defendants' "then or thereafter-existing debts,

obligations, and liabilities to [Plaintiff] under" certain loan documents and "the Lease Documents." (Dkt. 16-2 at ¶ 15). The Limited Guaranty secured the payment of Defendants' obligations up to $300,000, plus other fees, costs, and interest accruals. (*Id.*). In connection with the Limited Guaranty, on May 12, 2017, Plaintiff agreed "to forebear from enforcing its rights resulting from the occurrence of certain events of default by [Defendants] through the earlier of December 29, 2017, or the occurrence of any further events of default. . ." (the "Initial Forbearance Agreement"). (*Id.* at ¶ 16).

Then, on June 11, 2017, *The Buffalo News* published an article that reported a "pending federal investigation into [Defendants'] billing practices[,] . . . including possible fraudulent activities," and that a whistleblower lawsuit had been filed in the Western District of New York, which alleged that Defendants had committed fraudulent activities that cost the federal and state governments ten to fifteen million dollars. (Dkt. 16-2 at ¶ 8). The article also quoted Dr. Yi, who confirmed the existence of the federal investigation. (*Id.*). Plaintiff subsequently learned that Defendants were encumbered with various federal tax liabilities, Defendants had "stopped paying their real estate lease payments . . . on all but one of their properties," and that for a thirteen-week period, Defendants had operated "at a negative cash flow of $2,415,455[,] . . . and thus [were] unable to pay their ordinary debts." (*Id.* at ¶ 50).

On or about October 10, 2017, the parties amended the Initial Forbearance Agreement and increased the amount of Defendants' obligations secured under the Limited Guaranty to $2,300,000 (the "Amended Forbearance Agreement"). (*Id.* at ¶ 20). In addition, the Yi Defendants agreed to pay certain New York State tax refunds to Plaintiff

to "pay down the outstanding Obligations," and to send Plaintiff two "make-up" payments for expending certain federal tax refunds they had previously agreed to apply to their contractual obligations. (*Id.* at ¶ 21; *see id.* at ¶ 23 (indicating that the Yi Defendants assigned there "rights, title and interests in the State Tax Refunds to [Plaintiff]")).

Later that month, the Government recorded federal tax liens assessing unpaid federal tax balances against Defendants, and various other tax obligations and penalty costs became due as against Defendants. (*Id.* at ¶ 25). In addition, on November 1, 2017, Defendants failed to make principal and interest payments to Plaintiff as required by the Amended Forbearance Agreement. (*Id.*). Plaintiff then sent a notice to Defendants on November 8, 2017 (the "Notice"), stating that Defendants' failure to satisfy their tax obligations and adhere to their contractual payment schedule each constituted an "Event of Termination" under the Amended Forbearance Agreement. (*Id.* at ¶ 26; *see* Dkt. 16-12 (Notice)). As a result, Plaintiff also increased the amount Dr. Yi owed under the Limited Guaranty to $3,330,000. (Dkt. 16-2 at ¶ 27). In addition, the Notice further explained that each of the Events of Termination constituted an "Event of Default" under the Master Lease Agreement, and that the imposition of federal tax liens as well as Defendants' failure to pay their contractual obligations constituted additional Events of Default under the Loan Agreement. (*Id.* at ¶ 27; *see* Dkt. 16-12 at 3-4).

On November 22, 2017, Plaintiff sent a demand letter to Defendants notifying them that it had elected to accelerate and declare due the outstanding balance on the first line of credit as a result of the various Events of Termination noted above (the "Demand Letter"). (Dkt. 16-2 at ¶ 29; *see* Dkt. 16-13 (Demand Letter)). Plaintiff further demanded that the

entire $3.3 million under the Limited Guaranty, the second "make-up" payment for Defendants' failure to surrender the federal tax refund—in the amount of $537,000—and any state tax refunds in their possession be delivered by November 30, 2017. (Dkt. 16-2 at ¶ 30; *see* Dkt. 16-13 at 4-5 (Demand Letter)). Defendants then failed to make any principal or interest payments that were due on December 1, 2017. (Dkt. 16-2 at ¶ 33). On December 1, 2017, Plaintiff increased the amount Dr. Yi owed under the Limited Guaranty to $4.3 million. (*Id.* at ¶ 35).

On December 21, 2017, Plaintiff sent Defendants an acceleration notice that—based upon the occurrence of the previously described events—declared the Master Lease Agreement and the related Lease Documents to be terminated, demanded Defendants to "cease the use of" the Collateral, and declared the entire outstanding balance of Defendants' obligations due and payable by January 2, 2018 (the "Acceleration Notice"). (*Id.* at ¶ 36; *see* Dkt. 16-15 at 3 (Acceleration Notice)). In addition, Plaintiff demanded the return of "all of the Collateral by January 3, 2018." (Dkt. 16-2 at ¶ 37).

Plaintiff then chose to take no further action against Defendants to enforce its rights in order "to permit additional time for due diligence to be completed by a potential/investor/purchaser" of Defendants' assets, and to allow Defendants time to secure an alternative source of financing. (*Id.* at ¶ 38). However, Plaintiff received a letter from the prospective purchaser, dated December 26, 2017 (the "Purchaser Letter"), which "confirmed that [Defendants'] operations [were] beset with numerous operational difficulties and poor accounting controls." (*Id.* at ¶ 52; *see* Dkt. 16-22; Dkt. 27 at 6-12 (Purchaser Letter)). Then, on January 25, 2018, the prospective purchaser emailed

Plaintiff, indicating that it was no longer interested in purchasing Defendants' assets. (Dkt. 16-2 at ¶ 39). Furthermore, on January 30, 2018, the New York State Department of Taxation and Finance sought to enforce a $198,680.06 state tax levy against Comprehensive Cancer Services Oncology, P.C. (*Id.*; *see* Dkt. 16-16 (State Tax Levy)).

On February 5, 2018, Plaintiff sent a final notice to Defendants, indicating that it would pursue civil litigation in light of the state tax levy, the federal tax liens, the previously noticed defaults and Events of Termination, Defendants' failure to secure alternative financing, and Defendants' continued possession and use of the Collateral (the "Final Notice"). (Dkt. 16-2 at ¶ 41; *see* Dkt. 16-17 at 2-3 (Final Notice)).

## PROCEDURAL HISTORY

On December 8, 2017, Plaintiff commenced this action against the Yi Defendants. (Dkt. 1). At that time, Plaintiff purposefully did not name the associated business entities in order to permit them time "to pursue either a sale or refinancing." (Dkt. 16-2 at ¶ 47). However, when Plaintiff determined that this would not occur—likely around the time it sent Defendants the Final Notice—Plaintiff filed an Amended Complaint on February 8, 2018, which named the Yi Defendants, Defendants, and the Government. (Dkt. 15). On the same day, Plaintiffs filed the pending motion that is the subject of this Decision and Order. (Dkt. 16).

On February 13, 2018, the Court held a motion hearing at which time the parties signed and executed a Consent Order. (Dkt. 22; Dkt. 23). Pursuant to the Consent Order, Plaintiff was granted leave to file the Amended Complaint on consent. (Dkt. 23 at ¶ 1). In addition, Defendants were temporarily restrained from "selling, transferring, pledging,

assigning, encumbering, or otherwise disposing of the Collateral," or removing it from its current location, "to the extent that any such actions [were] outside of the ordinary course of [Defendants'] business." (*Id.* at ¶ 2). Defendants further agreed to "produce such officers or employees with actual knowledge regarding the Collateral as may be necessary, to give deposition testimony. . . and [to] produce information to [Plaintiff] regarding the Collateral. . . ." (*Id.* at ¶ 3).

On March 2, 2018, Defendants filed their response in opposition to Plaintiff's application. (Dkt. 37; Dkt. 38; Dkt. 39; Dkt. 40). On the same day, the Government filed its response papers to Plaintiff's application, indicating that it did not oppose Plaintiff's request for relief "provided that Plaintiff may not alienate [the Government's] interests prior to a judicial determination (or agreement between [the Government] and Plaintiff[]), as to the priority rights and distribution of the assets/Collateral between Plaintiff and [the Government]." (Dkt. 41 at 3). On March 5, 2018, Plaintiff took the deposition testimony of Dr. Yi and David A. Bonk ("Bonk"), Defendants' Chief Financial Officer. (Dkt. 42-8; Dkt. 42-9). On March 9, 2018, Plaintiff filed its reply papers. (Dkt. 42). Oral argument was held before the undersigned on March 14, 2018, at which time the Court reserved decision.

## DISCUSSION

**I.**   **Plaintiff's Application for an Order of Seizure**

### A.   **Legal Principles**

Rule 64(a) of the Federal Rules of Civil Procedure provides that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies." Rule 64 applies to actions or claims requesting relief in the form of "replevin." Fed. R. Civ. P. 64(b). "Article 71 of the CPLR, entitled Recovery of Chattel, is such a state-law remedy." *Colonial Ford, Inc. v. Ford Motor Co.,* No. CIV-90-1157E, 1991 WL 5161, at *2 (W.D.N.Y. Jan. 8, 1991).

"New York Civil Practice Law & Rules § 7102 provides the rules for the recovery of chattel under New York State law." *Barlow Lane Holdings Ltd. v. Applied Carbon Tech. (Am.), Inc.,* No. 02-CV-928S(F), 2004 WL 1792456, at *3 (W.D.N.Y. Aug. 11, 2004), *report and recommendation adopted,* No. 02-CV-928S, 2004 WL 2110733 (W.D.N.Y. Sept. 22, 2004). An application for an order of seizure must be accompanied by an affidavit that identifies the chattel; states the plaintiff's entitlement and the defendant's wrongful possession thereof; identifies whether an action to recover the chattel has been filed and if the defendant has been served, is in default, or has appeared; the chattel's value; and that plaintiff is not aware of any defense to its claim. *See* CPLR 7102(c)(1)-(4), (6); *Barlow Lane Holdings Ltd.,* 2004 WL 1792456, at *3; *see also Colonial Ford, Inc.,* 1991 WL 5161, at *2 ("To obtain an order of seizure pursuant to

Article 71, a party must demonstrate that he is entitled to possession of a chattel wrongfully held by his adversary and that no defense to the claim is known to him."). If the plaintiff requests an order of seizure that authorizes "the sheriff to break open, enter and search for the chattel," the plaintiff must also provide sufficient facts "to establish probable cause to believe that the chattel is located at that place." CPLR 7102(c)(5).[2] Here, Plaintiff requests that an order of seizure issued by this Court authorize the United States Marshals Service to have such authority (Dkt. 16-1 at 18 n.5), and thus, it must satisfy this requirement as well. *See* CPLR 7102(d)(1) (authorizing a court to issue an order of seizure permitting law enforcement to "break open, enter and search for the chattel in the place specified in the affidavit" if it is not delivered by the defendant).

A breach of the terms of a financing agreement permits a plaintiff to "resort to its remedies provided by [the] security instrument and the Uniform Commercial Code." *Gen. Elec. Credit Corp. v. Marcella's Appliances Sales & Servs., Inc.*, 66 A.D.2d 927, 927-28 (3d Dep't 1978); *see Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01 Civ. 1047 (AJP), 2002 WL 31174470, at *23 (S.D.N.Y. Sept. 26, 2002) ("The law is clear that a secured lender may take possession without declaring a default and, indeed, without notice of any kind."). Pursuant to Section 9-609 of the Uniform Commercial Code, as adopted by New York State, upon default, a secured party "may take possession of the collateral" and "may render equipment unusable and dispose of collateral on a debtor's premises." N.Y. U.C.C. Law § 9-609(a). The secured party may proceed "pursuant to judicial

---

[2]     CPLR 7102(c)(7), which applies when an order of seizure is requested without notice to the other party, is not applicable here.

process" or "without judicial process, if it proceeds without breach of the peace." (*Id.* § 9-609(b)).  Where a defendant refuses "to surrender possession of the collateral subject to the security agreement voluntarily," a plaintiff may proceed pursuant to CPLR 7102. *Gen. Elec. Credit Corp.*, 66 A.D.2d at 928.

"To establish a cause of action under Article 71, a plaintiff must show that it has an immediate and superior right to possession of the goods." *Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 248-49 (E.D.N.Y. 1999) (citing *Dubied Mach. Co. v. Vt. Knitting Co.*, 739 F. Supp. 867, 872 & n.4 (S.D.N.Y. 1990)); *see Colonial Ford, Inc.*, 1991 WL 5161, at *2 (noting that the purpose of Article 71 "is to determine which of the parties before the [c]ourt has the superior possessory interest in the chattel").  A plaintiff must also establish a likelihood of success on the merits of its replevin action.  CPLR 7102(d) (authorizing a court to issue an order of seizure "[u]pon presentation of the affidavit and undertaking and upon finding that it is probable the plaintiff will succeed on the merits and the facts are as stated in the affidavit"); *Amplicon, Inc. v. Info. Mgmt. Techs. Corp.*, No. 99 Civ. 2990 (LMM), 1999 WL 688430, at *1 (S.D.N.Y. Sept. 2, 1999) (citing CPLR 7102(d) and noting that the plaintiff must establish that it will "likely succeed on the merits").

Under New York law, "default under the note and the provision of the loan agreement for a security interest in their inventory and a right to possession upon default establish [a] plaintiff's prima facie entitlement to the provisional remedy of seizure." *Merchants Bank of N.Y. v. Itzkoff*, 1 A.D.3d 178, 178-79 (1st Dep't 2003).  Once established, it is the defendant's obligation "to come forward with evidentiary facts

demonstrating 'the existence of a material issue of fact with respect to a bona fide defense.'" *Id.* at 179 (quoting *Sacco v. Sutera*, 266 A.D.2d 446, 447 (2d Dep't 1999)).

**B.    Plaintiff Has Established *Prima Facie* Entitlement to an Order of Seizure**

Here, the Security Agreement secures Defendants' accounts receivable and equipment as Collateral in favor of Plaintiff in the event of a future default by Defendants on their transactional obligations. (*See* Dkt. 16-5 at ¶ 1). Defendants agreed that Plaintiff could file a financial statement to perfect its interest in the Collateral (*id.* at ¶ 3), and Nanette C. Franco, one of Plaintiff's Senior Vice Presidents ("Franco"), has averred that Plaintiff has done so (Dkt. 16-2 at ¶ 11). In the event of a default, as that term is described in the Security Agreement, Plaintiff was granted a number of remedies, including the repossession and sale of the Collateral. (Dkt. 16-5 at ¶ 6). Such a default would occur if Defendants failed to comply with their obligations in the Security Agreement or "any other contract or instrument" evidencing indebtedness. (*Id.* at ¶ 5).

Franco's affidavit not only establishes the existence of the various transactional agreements that underscore this action, but it also demonstrates the occurrence of Defendants' numerous defaults on their obligations. Plaintiff describes these defaults, which include Defendants' failure to comply with their tax obligations, and the subsequent imposition of government tax liens and levies against Defendants, as "Events of Termination" under certain loan documents, the Lease Documents, and the Amended Forbearance Agreement. (Dkt. 16-2 at ¶¶ 25-26, 28, 40; *see* Dkt. 16-12 at 3-4). Franco also averred that Defendants' failure to make timely principal and interest payments to

Plaintiff amounted to further defaults by Defendants on their obligations to Plaintiff. (Dkt. 16-2 at ¶¶ 33-36; *see* Dkt. 16-15 at 3-4). As a result of these cumulative failures, which took place over the period of several months, Plaintiff commenced the instant litigation. (Dkt. 16-2 at ¶ 41). Furthermore, Dr. Yi's and Bonk's deposition testimony confirm that Defendants failed to pay their tax liabilities or the money owed to Plaintiff, and remain unable to do so. (Dkt. 42-8 at 9-10, 15-16, 19; Dkt. 42-9 at 10-11, 28). Indeed, Defendants are not even able to stay current with their ordinary debts, such as lease payments, utility bills, and vendor commitments. (Dkt. 42-8 at 31-32, 34; Dkt. 42-9 at 3-6).

The evidence indisputably demonstrates that Defendants have defaulted upon their obligations to Plaintiff. Numerous courts have found the issuance of an order of seizure to be proper where a security agreement provides the plaintiff with a right of possession to the secured collateral after a default by the defendant, and the evidence demonstrates that a default has occurred. *See, e.g.*, *Merrill Lynch Commercial Fin. Corp. v. Am. Standard Testing & Consulting Labs., Inc.*, No. CV-09-4721 (SJF) (ARL), 2010 WL 114280, at *7 (E.D.N.Y. Jan. 12, 2010) (finding that the plaintiff had a "'superior possessory right' to the [c]ollateral" and "established its probable success on the merits of its claim to recover possession of the [c]ollateral" where the plaintiff held "a perfected security interest in the [c]ollateral," the defendants were in default, and the plaintiff had been granted the right to possess the collateral upon default); *Barlow Lane Holdings Ltd.*, 2004 WL 1792456, at *3 ("[The p]laintiff's affidavit in support of the motion establishes the fact of the loan, the breach of the loan obligation, [the p]laintiff's security interest in the graphite and [the p]laintiff's entitlement under the security agreement to take possession of the graphite

inventory.");  *Paxall Circle Mach. v. My Brands, Inc.*, No. 89 Civ. 3008 (RWS), 1989 WL 86039, at *4 (S.D.N.Y. July 27, 1989) (finding that the defendant was in default and that the security agreement "clearly states upon default, [the plaintiff] has the right to possession of the property[,]" and thus, concluding that the plaintiff "has proven [its] right to possession . . . and has demonstrated a likelihood of success on the merits"); *Honeywell Info. Sys., Inc. v. Demographic Sys., Inc.*, 396 F. Supp. 273, 277 (S.D.N.Y. 1975) (determining that the defendant was in default, and that the "plaintiff had a right to immediate possession of the equipment . . . since the equipment was the collateral under the Installment Sales Agreement securing the promissory note").

Furthermore, Franco avers that the primary collateral at issue is Defendants' "accounts receivable and equipment, since [Defendants] have minimal inventory and other assets." (Dkt. 16-2 at ¶ 53). Plaintiff has estimated the value of the accounts receivable, as of October 31, 2017, at $8,104,754.59. (*Id.*; *see* Dkt. 16-23; Dkt. 27). In addition, Todd C. Wittenberg ("Wittenberg"), a Senior Vice President for Plaintiff, has also submitted an affidavit, which specifically identifies the equipment collateral and its locations. (Dkt. 16-24 at ¶ 19). Wittenberg provides the addresses at which this equipment can be located, and has estimated its aggravated value at $3,445,000.00. (*Id.* at ¶¶ 19-20). Both Wittenberg and Franco aver that Plaintiff is not aware of any known defenses to its "claims for breach of contract and possession of the Collateral." (Dkt. 16-2 at ¶ 59; *see* Dkt. 16-24 at ¶ 22). Accordingly, the Court finds that Franco's and Wittenberg's averments establish almost all of the requirements of CPLR 7102 by setting forth the existence, value, location, and

possession of the Collateral.[3] *See Barlow Lane Holdings Ltd.*, 2004 WL 1792456, at *3 (finding that the affidavit "sufficiently identified" who possessed the graphite and "its value and location," and indicated that "an action ha[d] been commenced in this court for breach of contract and that [the] plaintiff [sic] has no defense to the action.").

As Defendants point out (Dkt. 40 at 4-5), and as Plaintiff acknowledges (Dkt. 42 at 12-13), an undertaking pursuant to CPLR 7102(e) has not yet been posted in relation to the Collateral. Defendants argue that a bond of $23,099,873 must be posted, which is twice the value of the Collateral as calculated by Plaintiff. (Dkt. 40 at 4-5). In its reply papers, Plaintiff argues that the Court should impose a lesser undertaking requirement than the amount suggested by Defendants because "there is no certainty that those values will be realized by [Plaintiff]"—due to Defendants' growing tax liabilities—and given Plaintiff's "financial strength." (Dkt. 42 at 12-13).

"CPLR § 7102(e) requires that an undertaking be posted for an amount 'not less than twice the value of the chattel stated in the plaintiff's affidavit, for the return of the chattel to any person to whom possession is awarded by the judgment, and for payment of any sum awarded by the judgment against the person giving the undertaking.'" *Amplicon, Inc.*, 1999 WL 688430, at *4. The requirement that the undertaking be no less than twice the value of the chattel identified by the plaintiff appears to be mandatory. *See* CPLR 7102(e) ("The condition of the undertaking *shall be* that the surety is bound in a specified

---

[3]  At oral argument, Plaintiff's counsel confirmed that Plaintiff had received copies of the Collateral referred to as "Books and Records" in the Security Agreement. (*See* Dkt. 16-5 at 2).

amount, not less than twice the value of the chattel stated in the plaintiff's affidavit. . . ."
(emphasis added)).  The Court notes that at least one court has held that this requirement
may be waived in certain circumstances, *see Merrill Lynch Commercial Fin. Corp.*, 2010
WL 114280, at *7, but such is not the case in the present matter.

Indeed, this provision is intended to serve the important purpose of "protect[ing] the
defendant in the event seizure proves to be improper."  *Amplicon, Inc.*, 1999 WL 688430,
at *4; *see Licensing Servs. Int'l v. Howe Chem. Co.*, No. CV-93-2556, 1995 WL 744996,
at *2 (E.D.N.Y. Dec. 6, 1995) (noting that "the purpose of an allegation of value in replevin
is to 'enable the defendant to obtain security or assurance of payment for deprivation of
the replevied chattel or consequent damage'" (citing *L. & Y. Food Prod. Corp. v. Delmonte
Ice Cream Co.*, 109 N.Y.S.2d 522, 524 (Sup. Ct., New York County, 1951))).  New York
authorities require that the plaintiff satisfy this requirement before an order of seizure is
granted.  *See Johanson Res. Inc. v. La Vallee*, 271 A.D.2d 832, 836-37 (3d Dep't 2000)
(noting that the plaintiff "has demonstrated that he is willing and capable of providing an
undertaking in an amount equal to twice the value of the equipment in compliance with
CPLR 7102(a) and (e)"); *Mercedes Benz Credit Corp. v. Reliable Auto Body & Towing*, 4
Misc. 3d 1026(A), at *2 (N.Y. Sup. Ct., Albany County, 2004) (finding that there was
"nothing in [the] record which indicates what the value of the subject vehicle is so that the
Court can determine whether the undertaking is at least twice the value of the subject
vehicle and, therefore, whether to approve the undertaking"); Siegel, N.Y. Prac. § 339 (6th
ed. 2018) ("Accompanying the affidavit *must be* an undertaking, *in not less than twice the
chattel's value*, to the effect that the chattel will be given to whoever is awarded possession

by the final judgment and that the surety will pay any sum of money the judgment may award against the person furnishing the undertaking." (emphases added) (footnote omitted)); *see also Amplicon, Inc.*, 1999 WL 688430, at *4 (noting that CPLR 7102(e) "requires" the satisfaction of this bond condition); *but see Agway, Inc. v. N. Clymer Farm Serv., Inc.*, 291 A.D.2d 818, 819 (4th Dep't 2002) (determining that a bond was "inapplicable" where the "defendant consented under a reservation of rights to the taking of their inventory by [the] plaintiff").

Plaintiff has provided no case support for its request to diverge from this clear statutory command, and the Court sees no means of doing so without altering the language and the intent of CPLR 7102(e). However, at oral argument Plaintiff's counsel confirmed that Plaintiff is "willing and capable" of posting the $23,099,873 bond. *Johanson Res. Inc.*, 271 A.D.2d at 836-37. Since Plaintiff has agreed to post a bond representing twice the value of the Collateral,[4] the Court concludes that Plaintiff has demonstrated *prima facie* entitlement to the seizure of the equipment and accounts receivable. *See Barlow Lane Holdings Ltd.*, 2004 WL 1792456, at *3 ("[The p]laintiff has agreed to post a bond in the amount of $308,295.44, twice the amount of the value of the graphite.").

## C.  Defendants Have Failed to Rebut Plaintiff's *Prima Facie* Entitlement to Seizure by Raising a *Bona Fide* Defense

In their memorandum in opposition, Defendants do not contest Plaintiff's arguments regarding the issuance of an order of seizure, except to the extent that Defendants argue

---

[4]     This figure may be well in excess of the actual value of the Collateral, but it represents twice the value of the Collateral as set forth in Plaintiff's motion papers, consistent with the requirements of CPLR 7102(e).

that Plaintiff must post a sufficient "undertaking" pursuant to CPLR 7102(e).  (Dkt. 40 at 4-5).  The Court notes that Defendants have submitted several affidavits in response to Plaintiff's motion.  (Dkt. 37; Dkt. 38; Dkt. 39).  None of these affidavits raises a *bona fide* defense to Plaintiff's entitlement to seizure.

Dr. Yi's affidavit describes various precursor events leading up to the filing of the present application, including Defendants' attempts to reduce the balance owed to the Government and Plaintiff.  (Dkt. 37).  Dr. Yi's affidavit warrants some additional discussion because he requests that any order of seizure and injunctive relief be "denied until at least June 30, 2018," while Defendants are pursuing financial alternatives.  (Dkt. 37 at 5-6).  At the motion hearing, Defendants implored the Court to defer issuance of an order of seizure and a preliminary injunction until June of this year to provide additional time for a "monetization event."  However, Defendants could not offer the Court any concrete assurances that their financial circumstances would materially change between now and then.  Indeed, when pressed on the issue, Defendants' counsel retreated from his initial request to defer any relief until June, inquiring whether the Court would be inclined to at least defer relief until April.  Although the Court can appreciate Defendants' desire for more time, it is evident that Defendants' request is supported merely by the hope that their fortunes will change, with no plan to effectuate such action.  This conclusion is further supported by Bonk's deposition testimony, which confirms that Defendants have not received any firm commitments for alternative financing.  (Dkt. 42-9 at 21-22, 25).

Defendants also submit the affidavit of Robert G. Trusiak, Esq., counsel for Comprehensive Cancer Services Oncology, P.C., which seeks to diminish the fact that

Defendants are currently under investigation in the *qui tam* whistleblower suit by noting that it is the federal government's mandatory obligation to pursue a whistleblower claim regardless of its merit. (Dkt. 38 at 2-4). However, these averments have no bearing on the undisputed fact that Defendants have defaulted multiple times on their obligations to Plaintiff.

Finally, Bonk submits an affidavit averring that despite a financially "disastrous" 2017 year, Defendants have planned to restructure their work force with the hope of achieving a projected $46 million in profit for 2018. (Dkt. 39). Bonk's averments also fail to raise any *bona fide* defense. Indeed, Bonk testified that Defendants have not yet achieved the numbers projected for the month of January. (Dkt. 42-9 at 35). Bonk also admitted that these projections do not include any consideration for principal payments owed to Plaintiff, and he described them as "kind of a work in progress." (*Id.* at 36-37). Bonk indicated that these charts represent only "operational cash flow," and should not be considered as a "full-blown projection." (*Id.* at 37). As such, the Court gives little weight to Bonk's projections.

Therefore, the Court finds that none of these affidavits raise a *bona fide* defense to Defendants' admitted breach of their obligations owed to Plaintiff. In light of this finding, Defendants are subject to the ramifications of their default, according to the terms of the Security Agreement. Accordingly, as it pertains to the accounts receivable and the equipment collateral, the Court will issue an order of seizure upon Plaintiff's filing of the $23,099,873 undertaking. *See Red Apple Supermarkets, Inc. v. Malone & Hyde, Inc.*, 228 A.D.2d 176, 177 (1st Dep't 1996) (affirming the grant of an order of seizure upon a

satisfactory "showing [of] probable success on the merits, entitlement to possession of the collateral, that the collateral was wrongfully held and that no claim or defense is known to the movant, and by providing an undertaking acceptable to the court in an amount equal to twice the value of the collateral in compliance with CPLR 7102(a) and (e)"). The Court directs Plaintiff to file a proposed order of seizure for the Court's approval within seven (7) days of this Decision and Order.

## II.    Plaintiff's Motion for a Preliminary Injunction

### A.    Legal Standard

In order to obtain a preliminary injunction, the moving party must establish the following: (1) a likelihood of irreparable harm absent preliminary relief; (2) a likelihood of success on the merits; (3) the balance of equities tipping in favor of the moving party; and (4) the public interest is served by an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit generally permit a movant who has established irreparable harm to demonstrate *either* "a likelihood of success on the merits, or . . . sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *Able v. United States*, 44 F.3d 128, 130 (2d Cir. 1995) (quotation marks and citation omitted).

### B.    Federal Law Governs the Standard for Granting Injunctive Relief in this Case

Plaintiff argues that the Court should issue a preliminary injunction prohibiting Defendants from "*inter alia*, transferring or further interfering with the possessory rights of [Plaintiff] in the Collateral in any way." (Dkt. 16-1 at 19). Defendants argue that a

preliminary injunction of the sort requested here is contrary to New York law. (Dkt. 40 at 2). Specifically, Defendants rely upon the principles outlined in *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541 (2000). In *Credit Agricole*, the New York State Court of Appeals explained that the plaintiffs were "unsecured contract creditors, whose ultimate objective is attaining an enforceable money judgment. Their third cause of action for injunctive relief to prevent the threatened dissipation of [the defendant]'s assets, making it judgment proof, is incidental to and in aid of the monetary relief they seek." *Id.* at 545. Relying on long-established state precedent, the court held that "in a pure contract money action, there is no right of the plaintiff in some specific *subject* of the action; hence, no prejudgment right to interfere in the use of the defendant's property; and no entitlement to injunctive relief pendente lite." *Id.*

Importantly, the *Credit Agricole* court referenced the fact that the Supreme Court "came to the very same conclusion—that an unsecured creditor suing to collect a debt was not entitled to preliminary injunctive relief to prevent the debtor's dissipation of assets prior to judgment." *Id.* (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999)). Finding that such a provisional "remedy was historically unavailable from a court of equity," the Supreme Court held that a district court has "no authority to issue a preliminary injunction preventing [the] petitioners from disposing of their assets pending adjudication of [the] respondents' contract claim for money damages." *Id.* at 333. Notably, the *Grupo Mexicano* decision distinguished the situation attendant to general unsecured creditors from that involving a creditor asserting some interest in or on the property. *See id.* at 326 (distinguishing past precedent where "the creditor (the

Government) asserted an equitable lien on the property, which presents a different case from that of the unsecured general creditor" (citation omitted)).

It should be noted that neither party references *Grupo* or argues whether federal or state injunction statutes apply—Rule 65 of the Federal Rules of Civil Procedure or CPLR 6301, respectively. Indeed, Plaintiff requests a preliminary injunction under both Rule 65 of the Federal Rules and New York's CPLR 6301 provisions. (Dkt. 16-1 at 19). However, it seems well-settled that "[t]he question whether a preliminary injunction should be granted is generally one of federal law even in diversity actions, though state law issues are sometimes relevant to the decision to grant or deny." *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987); *see Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 186 (N.D.N.Y. 2005) ("While the claims asserted by the plaintiff are common law causes of action sounding in breach of contract and tort, federal law controls and governs the standard to be applied in determining plaintiff's entitlement to the injunctive relief now sought."); *see also Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 441 (E.D.N.Y. 2013) (noting that "although 'proof of irreparable injury is not required to obtain a preliminary injunction' under applicable Louisiana state law, 'Rule 65 is a procedural rule and applies to determine whether preliminary injunctive relief is appropriate in a diversity case'" (quoting *KV Pharm. Co. v. Medecor Pharma, L.L.C.*, 354 F. Supp. 2d 682, 685 (E.D. La. 2003))).

Furthermore, neither party affirmatively claims that state law, rather than federal law, represents the governing standard for determining the issuance of a preliminary injunction in a diversity case. *See Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No.

11 CIV. 3489 (JMF), 2013 WL 1915330, at *2 n.1 (S.D.N.Y. May 9, 2013) ("Like the respondents in *Grupo Mexicano*, [the plaintiff] has not argued that the availability of an injunction should be determined by the law of the forum state. Therefore, like the Supreme Court in that case, this Court declines to consider that argument." (citation omitted)); *see Grupo Mexicano de Desarrollo S.A.*, 527 U.S. at 319 n.3 (declining to entertain the argument that *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) requires the law of the forum State be used to determine the issuance of a preliminary injunction in a diversity case). As the court in *Paradigm Biodevices* noted, federal and New York law appear to be aligned on this issue. *See Paradigm BioDevices, Inc.*, 2013 WL 1915330, at *2 n.1; *Credit Agricole Indosuez*, 94 N.Y.2d at 545-47.

Therefore, although the Court need not determine whether federal law or the law of the forum State must always govern the issuance of a preliminary injunction in a diversity suit, the Court will consider Plaintiff's application for a preliminary injunction under principles of federal law.

### C. *Grupo Mexicano* Does not Control The Instant Matter

Since the Supreme Court's decision in *Grupo Mexicano*, courts have held that "[t]he [c]ourt's equitable power to issue a preliminary injunction to prevent a defendant from transferring assets does not extend to an action for money damages where the plaintiff claims no lien or equitable interest in the assets sought to be enjoined." *Nanjing Textiles IMP/EXP Corp. v. NCC Sportswear Corp.*, No. 06 Civ. 52 (JGK), 2006 WL 2337186, at *7 (S.D.N.Y. Aug. 11, 2006) (citing *Grupo Mexicano de Desarrollo S.A.*, 527 U.S. at 333); *see Coley v. Vannguard Urban Improvement Ass'n, Inc.*, No. 12-CV-5565 (PKC) (RER),

2016 WL 7217641, at \*3 (E.D.N.Y. Dec. 13, 2016) ("[C]ourts consistently refuse to allow preliminary injunctions when such injunctions essentially 'seek[ ] security for a potential future award of money damages' and are requested merely because of a 'feared inability to collect a prospective judgment.'" (quoting *Essroc Cement Corp. v. CPRIN, Inc.*, 593 F. Supp. 2d 962, 971 (W.D. Mich. 2008))); *Tang Capital Partners, LP v. Cell Therapeutics, Inc.*, 591 F. Supp. 2d 666, 671-72 (S.D.N.Y. 2008) ("*Grupo Mexicano* stands for the proposition that a plaintiff who has sued for a completed breach of a contract cannot 'secure' the money judgment to which he may someday become entitled by 'holding up the money,' as it were, through an injunction against any transfer of [the] defendant's assets. . . ."). Nonetheless, Plaintiff argues that there is a distinction between unsecured general creditors, and a secured creditor. (Dkt. 42 at 11-12). The Court agrees.

Indeed, several courts have distinguished *Grupo Mexicano* on this ground. *See Motorola, Inc. v. Abeckaser*, No. 07-CV-3963(CPS)(SMG), 2009 WL 1362833, at \*4 n.4 (E.D.N.Y. May 14, 2009) (distinguishing *Grupo Mexicano* and noting that the "plaintiff holds something akin to a security interest in [the] defendants' assets"); *Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of VA.*, 144 F. Supp. 2d 241, 249-50 (S.D.N.Y. 2001) (distinguishing *Grupo Mexicano* because the plaintiff held a perfected security interest in the receivables); *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 Civ. 8051 (JSM), 2000 WL 1610790, at \*1 (S.D.N.Y. Oct. 27, 2000) ("[C]ourts since *Grupo Mexicano* have found that where plaintiffs seek both equitable and legal relief in relation to specific funds, a court retains it[s] equitable power to freeze assets."); *III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*, No. 99 Civ. 2579 (DC), 1999 WL 461808, at

*4 n.1 (S.D.N.Y. July 2, 1999) ("The *Grupo* case is inapplicable here because [the plaintiff] claims a security interest in the assets subject to the preliminary injunction."); *see also WM Capital Partners I, LLC v. BBJ Mortg. Servs., Inc.*, No. 10-10359, 2010 WL 5903262, at *2 (E.D. Mich. Aug. 17, 2010) (explaining that a preliminary injunction is properly issued to preserve the *status quo*, even if "the plaintiff's remedy for a loan default was ultimately a money judgment," where the plaintiff "had a security interest in certain of the defendant's assets, including its accounts receivable" (citing *Plainfield Specialty Holdings II Inc. v. Children's Legal Servs. PLLC*, 634 F. Supp. 2d 833, 846 (E.D. Mich. 2009))), *report and recommendation adopted*, No. 10-10359, 2011 WL 806705 (E.D. Mich. Mar. 2, 2011). Similarly, under New York law, "[a]ssets such as . . . negotiable instruments, securities or monies in a specified fund in which the plaintiff claims a security interest or other pre-existing interest that are the center of a legal action will generally qualify as 'the subject of the action' within the purview of CPLR 6301." *County of Suffolk v. Love'M Sheltering, Inc.*, 27 Misc. 3d 1127, 1133 (N.Y. Sup. Ct., Suffolk County, 2010).

In the instant matter, it is undisputed that Plaintiff is a secured creditor who holds a security interest over the Collateral, as granted by Defendants through the Security Agreement. The same principles that apply in constraining this Court's authority to issue a preliminary injunction freezing a defendant's assets pending a money judgment do not apply where, as here, Plaintiff holds a security interest in the Collateral and there is a "strong nexus" between the Collateral and any future money judgment. *Quantum Corp. Funding, Ltd.*, 144 F. Supp. 2d at 250; *see, e.g., Motorola, Inc.*, 2009 WL 1362833, at *4 n.4; *III Fin. Ltd.*, 1999 WL 461808, at *4 n.1.

Furthermore, since Plaintiff established a probable likelihood that it "it will succeed on the merits" in relation to the issuance of the order of seizure, *see* CPLR 7102(d), the Court finds that Plaintiff has established a likelihood of success on the merits of its preliminary injunction application. *See Barlow Lane Holdings Ltd.*, 2004 WL 1792456, at *5 ("Having found that [the p]laintiff is entitled to an order of seizure, the court is satisfied as to the likelihood of success on the merits.").

### D. Plaintiff has Demonstrated Irreparable Harm

The most important prerequisite to issuing a preliminary injunction is irreparable harm. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Plaintiffs seeking preliminary injunctive relief must affirmatively "demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "The movant is required to establish not a mere possibility of irreparable harm, but that it is 'likely to suffer irreparable harm if equitable relief is denied.'" *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) (quoting *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990)).

Even where an order of seizure has been issued, courts have still found the irreparable harm requirement to be left unsatisfied under certain circumstances. *See, e.g.*, *Am. Honda Fin. Corp. v. V.M. Paolozzi Imports, Inc.*, No. 710-CV-0155 (GTS/ATB), 2010 WL 1189342, at *3 (N.D.N.Y. Mar. 24, 2010); *Nissan Motor Acceptance Corp. v.*

*Dealmaker Nissan, LLC*, No. 7:09-CV-0196 (GTS/GJD), 2009 WL 667452, at \*2 (N.D.N.Y. Mar. 11, 2009); *Barlow Lane Holdings Ltd.*, 2004 WL 1792456, at \*5. Specifically, these courts determined that an injunction should not issue because a money judgment would suffice as an adequate remedy. However, "although injuries compensable by monetary damages ordinarily do not justify the remedy, '[a] preliminary injunction may issue to preserve assets as security for a potential monetary judgment where the evidence shows that a party intends to frustrate any judgment on the merits by making it uncollectible.'" *Bank of China, N.Y. Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 191-92 (S.D.N.Y. 2002) (quoting *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 86-87 (2d Cir. 1996) (quotation marks omitted)).

In *Republic of Philippines v. Marcos*, 806 F.2d 344 (2d Cir. 1986), the Second Circuit stated that "the preliminary relief sought by [the plaintiff] is intended to prevent any transfer or encumbrance of the properties that would place them beyond [the plaintiff]'s reach or would prevent reconveyance of the properties to [the plaintiff]." *Id.* at 356. Noting that "preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible," the *Marcos* court found that a preliminary injunction was appropriate. *Id.* These principles apply with equal force to Plaintiff's request for injunctive relief.

Here, Plaintiff claims that it has established the existence of irreparable harm based upon its affidavit submissions indicating that Defendants have refused to relinquish the Collateral and "continue to use and dissipate the proceeds of the accounts receivable which secure the Obligations." (Dkt. 16-1 at 20). Plaintiff's application for injunctive relief is

not a request to prevent the dissipation or disposal of Defendants' *general* assets in order to eliminate the risk of never receiving a money judgment. *See Marcos*, 806 F.2d at 356 ("Of course a party is not entitled preliminarily to enjoin the transfer of property *that will be irrelevant* to a final judgment." (emphasis added)). Instead, Plaintiff has proffered evidence that Dr. Yi purposefully used a state tax refund, which Plaintiff held in security, in order to keep his business "afloat." (Dkt. 42-8 at 36-38); *see Pashaian*, 88 F.3d at 87 ("[T]he irreparable harm requirement is satisfied in this case, which involves completed actions to frustrate a judgment, rather than an inferred intention to take future such actions.").

In addition, it appears the value of Plaintiff's interest in the Collateral is eroding at a substantial rate every month due to Defendants' tax liabilities. (Dkt. 42 at 5 (arguing that Plaintiff's "Collateral continues to rapidly erode (at the rate of $600,000 per month) as a result of [Defendants'] continuing failure to pay their state and federal taxes"); Dkt. 42-8 at 10 (testifying that the "federal and state taxes are running about 600,000 a month"); Dkt. 42-9 at 10 (same)). In other words, it is quite possible that the millions of dollars owed to the federal and state authorities could prevent Plaintiff from receiving a substantial portion of the Collateral in which it holds a security interest. *See Marcos*, 806 F.2d at 356. These facts not only demonstrate an "actual and imminent" risk of irreparable harm, but that such harm is presently occurring. *See Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) ("[A] perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a

substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.").

Therefore, the Court finds that Plaintiff has established the existence of irreparable harm.

### E.     The Balance of Hardships Tips in Favor of Plaintiff

"When confronted with a motion for a preliminary injunction, a court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Main St. Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F. Supp. 3d 244, 262 (N.D.N.Y. 2015) (quoting *Winter*, 555 U.S. at 24). "[A] court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).

The Court finds that the balance of hardships weighs in favor of Plaintiff. To be sure, the order of seizure and a preliminary injunction preventing Defendants from interfering with Plaintiff's security interest in the Collateral may be the "final nail in the coffin" for Defendants' floundering business. However, Defendants have not submitted substantive evidence that they are making any progress towards securing alternative finance sources or reducing their debts outside of staffing cuts and internal restructuring. (*See* Dkt. 42-8 at 22). Meanwhile, Plaintiff's security interest in the Collateral, which may be valued at over $11 million (Dkt. 16-2 at ¶¶ 53-54; Dkt. 16-24 at ¶ 20), is likely eroding as a result of Defendants' failure to pay their tax obligations.

Notably, Plaintiff offered Defendants numerous opportunities to rectify their financial situation, and refrained from exercising its rights in civil litigation for several months, even after discovering numerous instances of default. Defendants' money troubles began long ago, and the fact that they are essentially insolvent has nothing to do with Plaintiff's ability to enforce its security interest in the Collateral. As such, the fact that Defendants may have to close their business does not tip the balances of hardships in their favor under these circumstances. *Cf. VoiceStream Wireless Corp. v. All U.S. Commc'ns*, 149 F. Supp. 2d 29, 38 (S.D.N.Y. 2001) (finding that the balance of hardships favored the defendant because the injunction "if issued, 'would cause [the defendant] to cease operations'").

Pursuant to the terms of the Security Agreement, Plaintiff is entitled to the possession and sale of the Collateral. Accordingly, the Court finds that the balance of hardships tips in favor of Plaintiff because it has been deprived of the benefit of enforcing its security interest while Defendants have stagnated in amassing public and private debt.

## F. Issuance of the Preliminary Injunction Serves the Public Interest

"[W]hen a court orders injunctive relief, it should ensure that the injunction does not cause harm to the public interest." *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 200 (E.D.N.Y. 2013) (quoting *U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012)). "There is a well-recognized public interest in enforcing contracts and upholding the rule of law." *Empower Energies, Inc. v. SolarBlue, LLC*, No. 16-cv-3220 (DLC), 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016); *see GE Transp. (Shenyang) Co. v. A-Power Energy Generation Sys., Ltd.*, No. 15 Civ. 6194 (PAE), 2016

WL 3525358, at *9 (S.D.N.Y. June 22, 2016) ("[T]he public interest is served by the enforcement of parties' rights under their contract. . . ."); *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978 (TPG), 2012 WL 5895784, at *2 (S.D.N.Y. Nov. 21, 2012) ("The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order. . . .").

The Court finds that the issuance of this injunction would serve the public interest by holding Defendants to their contractual obligations. In doing so, the Court does not overlook the public interest in medical care. It is regrettable that these two public interests are pitted against one another in this matter. Under different circumstances, this factor might have weighed in favor of Defendants. However, Plaintiff and Defendants freely and voluntarily entered into the various transactional agreements at issue in this action. Plaintiff was entitled to expect that it could hold Defendants to the terms of those agreements should a dispute arise. Now, as a result of Defendants' failure to adhere to their obligations, Plaintiff faces the potential loss of millions of dollars. "The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010); *see also Baltimore & O. S. W. Ry. Co. v. Voigt*, 176 U.S. 498, 505 (1900) ("[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear that they contravene public right or the public welfare.").

Defendants are unable to demonstrate that their circumstances would change over the next several months in the face of mounting debt. Healthcare providers, like any other business, must stay abreast of their contractual obligations. In fact, there is some suggestion in the record that the flow of resources available to Defendants has already threatened to impair their ability to provide for their patients. (*See* Dkt. 42-8 at 32, 34 (testifying that Defendants are millions of dollars in debt to "vendors," "goodwill" owed to physicians, and their "largest pharmaceutical supplier"); Dkt 42-9 at 6 (testifying that there have been threats of default from Defendants' landlords for the failure to pay rent); *id.* at 15 (testifying that paying for "net payroll and pharmaceuticals pretty much wipes out . . . what's available"); *id.* at 30 (testifying that Defendants are paying for their pharmaceutical supplies cash on demand)); *see generally Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 142 n.10 (S.D.N.Y. 2016) (noting that "[t]he public has an interest in uninterrupted *and* safe medical care"). It is the Court's view that "the public interest here is served by the enforcement of the parties' lawful agreement[s]." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015).

Therefore, the Court concludes "that the 'public interest would not be disserved' by the issuance of a preliminary injunction" preventing Defendants from interfering with Plaintiff's rights in the Collateral. *Salinger*, 607 F.3d at 80 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Accordingly, the Court grants Plaintiff's request for a preliminary injunction to maintain the *status quo* pending the execution of an order of seizure upon the Collateral.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for an order of seizure and preliminary injunction [16] is granted. The Court will issue an order of seizure upon Plaintiff's filing of the $23,099,873 undertaking. Furthermore, Defendants, their officers, agents, servants, employees and any other persons acting in concert with or in participation with any of them, are hereby enjoined from transferring, selling, concealing, pledging or otherwise disposing of, or substantially impairing the value of any and all of the Collateral outside the ordinary court of Defendants' operations. Plaintiff is directed to file a proposed order of seizure for the Court's approval within seven (7) days of this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

DATED:    March 21, 2018
          Buffalo, New York

- 34 -